Filed 1/22/15  P. v. Yslas CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VICTOR YSLAS,<br><br>    Defendant and Appellant. | F066892<br><br>(Super. Ct. No. MCR038969)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Following a bench trial, defendant Victor Yslas was convicted of numerous sex offenses committed against his daughter as well as her kidnapping.  Additionally, he was

convicted of possessing pornographic images, kicking a police dog, and resisting arrest. Various special circumstance and prior conviction allegations were also found true. He was sentenced to a total of 207 years to life.

Defendant contends as follows: (1) the trial court committed reversible error by refusing his request to dress in civilian clothing and be free of handcuffs during the bench trial; (2) his waiver of the right to a jury trial was not knowing and intelligent; (3) his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) were violated during custodial interrogation; (4) defense counsel was ineffective for failing to suppress certain images on his cell phone on the theory the police acted in bad faith; and (5) there was insufficient evidence to find the Penal Code[1] section 667.61, subdivisions (a) and (d) enhancement true. We affirm.

## FACTUAL[2] AND PROCEDURAL BACKGROUND

On September 22, 2010, about 7:00 p.m., defendant picked up his 13-year-old daughter Jane Doe[3] from her home in Madera. When he called prior to picking her up, defendant said he wanted to take her out to eat and go to the movies.

After initially stopping at a fastfood restaurant where defendant used the restroom, Jane asked defendant to stop at a nearby park so that she could use the restroom. Jane was on her menstrual cycle and realized she needed to attend those specific needs. Once inside the stall in the women's restroom at Rotary Park, Jane used the toilet. However, before she could finish dressing, defendant entered the stall. Inside the stall, defendant told her to remove her clothing. Although she initially resisted, eventually Jane complied with her father's requests when he grabbed and pushed her, using an angry or aggressive tone in order to gain her compliance. Jane was afraid. Inside the stall, defendant took

---

[1]Unless indicated otherwise, all further statutory references are to the Penal Code.

[2]A more detailed recitation of the facts is not required for resolution of the issues on appeal. Where necessary, the facts will be discussed in more detail.

[3]Throughout the proceedings, the minor victim was referred to as Jane Doe. We shall continue to refer to her in the same manner; no disrespect is intended.

photographs of Jane with his cell phone. Specifically, he photographed her breasts, her buttocks, and her vagina, demanding she pose in certain positions. Defendant told her the photos would be worth a lot of money. During the incident, defendant rubbed and kissed her breasts, giving her a hickey. He also licked his fingers before placing them in her vagina, telling her she was not wet enough. Defendant directed Jane to lie down on the floor of the stall and told her to touch herself; he took pictures then, too. Jane noticed defendant had an erection.

Eventually defendant told Jane to get dressed. As she exited the restroom, defendant put his arm around Jane's neck and shoulders and directed her back to his car. Although there were six or so people present in the park at the time, Jane felt "frozen" and did not call out for help. Back in the car, defendant seemed to head in the direction of her home; that made her happy and she "kind of smiled" thinking about it. Defendant saw her reaction and told her she "liked that"; she replied she did not.

Instead of returning her home, however, defendant pulled into an alleyway behind some nearby retail stores. She told him she wanted to go home; he did not respond. He parked near some dumpsters, pulled her to him, and began kissing her. He told her to take her clothes off, but she did not. Defendant unzipped his own pants and grabbed Jane by the hair. He pulled his penis out; it had a barbell piercing. He pushed her head towards his penis with both hands and directed her to suck it. Later, after directing Jane to the backseat and removing her jeans, defendant demanded she get on her hands and knees. While standing at the open back passenger door, defendant put his penis in her vagina. Jane then saw blue and white lights in the rearview mirror and defendant stopped. He told Jane to say she was 19 years old and that her name was Jennifer Maxwell. He told her not to tell the police anything.

At about 8:30 p.m., Madera Police Officer Lori Alva pulled into the alleyway on routine patrol; also with the officer were her K-9 Axel and a citizen passenger on a ride-along. Officer Alva routinely patrolled that area—three or four times a night—because it was a thoroughfare for criminal activity. As she approached the dumpsters and the car

3.

parked close by, defendant jumped away from the rear passenger door. The officer noticed the passenger in the vehicle did not have on any pants and looked scared.

Defendant was nervous and sweating profusely. The officer performed a patdown search, noting defendant had an erection and an ankle monitor. She also noted that while defendant was being handcuffed, he was whispering or mouthing something to the passenger. Defendant denied having sex with the passenger, indicating he did not know her and had just met her. He was directed to sit on a nearby curb; Alva called for backup.

Asking the passenger to exit the car, Officer Alva noted the passenger was frightened. When asked her name and age, Jane said her name was Jennifer and she was 18 years old. However, she could not give an accurate date of birth. She became more emotional when questioned by Alva and began to cry. When Jane motioned for Alva to get closer, Jane quietly indicated she did not want to say it out loud. The officer handed Jane a notepad and pen; she wrote her name, a date of birth, and added, "He's my dad." When Alva asked Jane if her father had had sex with her, Jane replied, "Yes, he raped me." Defendant then jumped up and took off running.

Despite his attempt to escape, defendant was apprehended with the assistance of Alva's K-9 partner. Later, Officer Alva transported Jane to the police station to be interviewed. Following the recorded interview, Jane was transported for a sexual assault examination.

Thereafter, defendant was charged as follows: count 1—kidnapping to commit rape (§ 209, subd. (b)(1)); count 2—forcible rape (§ 261, subd. (a)(2)); count 3—lewd and lascivious act by force upon a child under 14 years of age (§ 288, subd. (b)(1)); count 4—forcible oral copulation of a child under 14 years of age (§ 288a, subd. (c)(2)(B)); count 5—lewd and lascivious act upon child under 14 years of age (§ 288, subd. (a)); count 6—forcible sexual penetration upon a child under 14 years of age (§ 289, subd. (a)(1)(B)); count 7—possession of child pornography (§ 311.11, subd. (a)); count 8— kicking a police dog (§ 600, subd. (a), misdemeanor); and count 9—resisting arrest (§ 148, subd. (a)(1), misdemeanor). A number of special allegations were alleged for the

4.

sex crimes (§§ 667.8, subd. (a) [count 2], 667.8, subd. (b) [counts 3 & 4], 667.61, subds. (a) & (d) [counts 2, 3, 4]).  And, a number of prior strike, serious or violent felony convictions, and prior prison terms were also alleged (§§ 667, subd. (a) [counts 1-7], 667, subds. (b)-(i) [counts 1-7], 667.5, subd. (b)).

## DISCUSSION

### I. Defendant's Restraints and Jail Garb

Defendant argues his due process rights were violated when the trial court refused to permit him to wear civilian clothing during his bench trial, and because he was handcuffed without a finding of necessity.  The People concede the court erred in refusing defendant's requests, however, they maintain the errors were harmless.  We agree with defendant that the court erred in denying his requests.  We also agree with the People that the errors were harmless.

### A. Legal Standards

"'A trial court has broad power to maintain courtroom security and orderly proceedings.' (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269; see *Illinois v. Allen* [1970] 397 U.S. [337,] 343.)  But this power is not unlimited.  The constitutional prohibition on forcing a criminal defendant to wear visible physical restraints during trial without special justification 'has deep roots in the common law.' (*Deck v. Missouri* (2005) 544 U.S. 622, 626 (*Deck*) [citing Blackstone and other early authorities]; see *People v. Duran* (1976) 16 Cal.3d 282, 288 (*Duran*) [same].)  Although originally motivated by concern for the physical suffering caused by chains or other restraints, the constitutional rule today reflects 'three fundamental legal principles.' (*Deck*, at p. 630.)

"'First, the criminal process presumes that the defendant is innocent until proved guilty.  [Citation.]  Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process.' (*Deck*, *supra*, 544 U.S. at p. 630.)  'Second, the Constitution, in order to help the accused secure a meaningful defense, provides him with a right to counsel.  [Citations.]  The use of physical restraints diminishes that right.  Shackles can interfere with the accused's "ability to communicate" with his lawyer.  [Citation.]  Indeed, they can interfere with a defendant's ability to participate in his own defense….' (*Id*. at p. 631.)  'Third, judges must seek to maintain a judicial process that is a dignified process.  The courtroom's formal dignity, which includes the respectful treatment of

defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve. The routine use of shackles in the presence of juries would undermine these symbolic yet concrete objectives.' (*Ibid.*)" (*People v. Jackson* (2014) 58 Cal.4th 724, 778-779 (conc. & dis. opn. of Liu, J.).)

A defendant cannot be required to wear physical restraints during trial unless there is a manifest need for such restraints. (*People v. Mar* (2002) 28 Cal.4th 1201, 1216; *People v. Jacobs* (1989) 210 Cal.App.3d 1135, 1140.) Manifest need may arise from a showing of violence, threat of violence, or other nonconforming conduct. (*Mar*, at p. 1217.) It is not proper for a court to adopt a general policy of imposing restraints upon those facing criminal charges. (*Id.* at p. 1218.) Rather, the court must make the decision whether to use physical restraints on a case-by-case basis. (*Ibid.*) Although no formal hearing is required, the trial court must make its determination based on facts, not rumor and innuendo. (*Ibid.*) We review a court's determination that restraints are necessary under the abuse of discretion standard. (*People v. Mar*, *supra*, at p. 1217.)

Further, as a matter of federal constitutional due process and equal protection, "the State cannot … compel an accused to stand trial before a jury while dressed in identifiable prison clothes …." (*Estelle v. Williams* (1976) 425 U.S. 501, 512.) "'[T]he presumption of innocence requires the garb of innocence, and … every defendant is entitled to be brought before the court with the appearance, dignity, and self respect of a free and innocent man [or woman], except as the necessary safety and decorum of the court may otherwise require.' [Citation]" (*People v. Taylor* (1982) 31 Cal.3d 488, 495.) A court may not, consistent with the Fourteenth Amendment, compel an accused to be tried in jail clothing. To do so impairs the presumption of innocence and puts those who cannot afford to post bail at a disadvantage. (*Estelle v. Williams*, *supra*, at p. 504; *People v. Taylor*, *supra*, at p. 495.)

6.

"[T]he trial judge should take all reasonable measures to assure that a defendant who so desires may stand trial in civilian clothes." (*People v. Taylor*, *supra*, 31 Cal.3d at p. 496.) Administrative inconvenience does not justify denial of the right to be tried in civilian clothing. (*Estelle v. Williams*, *supra*, 425 U.S. at p. 505.) The right to wear civilian clothing "may be waived only expressly or by failure to make a timely objection to the defendant's jail clothing." (*People v. Taylor*, *supra*, at p. 501.) The waiver must be "knowing." (*People v. Hetrick* (1981) 125 Cal.App.3d 849, 854.)

## B.     Defendant's Requests and the Court's Ruling

Defendant waived his right to a jury trial on October 3, 2012. On October 9, 2012, during pretrial proceedings, defendant raised the issue of his dress and restraints:

> "[DEFENSE COUNSEL]:  Another issue I had …  [¶] … [¶] [w]ould be if my client could still be allowed to be dressed out. And the reason being, of course, you seen [*sic*] him many times in the orange, but there would be witnesses here, many civilian. A few Officers, Marjie Jensen, I still think when they would look at [defendant] it might persuade their testimony seeing him in this way. I would request if he could continue to dress out. And at the very least have his handcuffs taken off if the Court feels there's a reason he can remain shackled on his feet. That would be my request.

> "THE COURT:  Is there any other basis for having his hands unshackled?

> "[DEFENSE COUNSEL]:  Your Honor, I don't believe—from my understanding of the law is that there has to be a reason that—a recent reason that he has acted up. When I say acted up did some sort of violence or made some accusation or something with the bailiffs in the back and I don't know anything.

> "THE COURT:  Generally that's when there's a jury involved. Do you have some authority that indicates otherwise when the Court's trying the matter?

> "[DEFENSE COUNSEL]:  No, Your Honor. Other than I believe, again, would be prejudicial for witnesses that are here not in front of your eyes I believe it they can—it may sway their testimony. It may cause them to—to do—act differently when testifying against [defendant].

> "THE COURT:  The People's position?

7.

"[PROSECUTOR]: I disagree. I think witnesses can be relied upon to tell the truth. They're under oath and I think they will do that. I can represent to the Court particularly with regard to the victim, she's much more comfortable with the defendant dressed as he currently is and shackled. I think that the Court can be relied upon obviously as the trier of fact to discount those and there's no reason to inconvenience the Court and to put any of us at any risk in this particular regard however small that risk might be of the defendant doing something foolish.

"[DEFENSE COUNSEL]: The only thing I would add, Your Honor, is that when we do have a jury I would expect the same, not judge the client by how he looks, but yet we still allow him to dress out because we're human. The shackles on the foot I think would be enough, there's a bailiff here. When (Jane Doe) does testify—Jane Doe does testify I don't see a reason if she feels uncomfortable having another bailiff standing next to her since there's no jury having been prejudiced by that action itself.

"THE COURT: What's the prejudice to the defendant then?

"[DEFENSE COUNSEL]: If—

"THE COURT: What's your concern, what are you anticipating the witnesses will do whether he's dressed or dressed out or not dressed out?

"[DEFENSE COUNSEL]: I think—

"THE COURT: You think they'll change their testimony?

"[DEFENSE COUNSEL]: I think it could change. It could change their tone of their testimony. The direction they may want to go. Probably not as much as Alva, she's an officer, but we have Marjie Jessen we have the Cell Bright. We have the DNA and some others that I believe when they look at him dressed in orange it's just a perception they have. And I believe their testimony may be swayed. It may go in a different direction. It may take a different tone. It may make them a little more evasive to my questions. And I believe it wouldn't prejudice the Court in terms of time or anything else if the clothes are back there and he dresses out every day.

"THE COURT: All right. Thank you. Anything else?

"[DEFENSE COUNSEL]: No.

"THE COURT: On than [*sic*] that issue?

[PROSECUTOR]: Briefly …. [¶] … [¶] Counsel indicated that he's afraid that witnesses might be swayed. With regard to the Cell Bright

8.

expert, Julie Williams, she's also a sheriff's deputy with a number of years of experience. And I'm sure as familiar as are Alva and officer Trukki. In terms of not being swayed by that. And with regard to the DNA expert her testimony she's never met the defendant. She has no—it's all scientific. She'll be talking about things that she did in a laboratory and in the presence of the defendant. I don't think will have any effect on her either. Additionally, Marjie Jessen has testified numerous times and is fully aware of the fact and implications. I think all of these witnesses are well beyond being influenced by the defendant's shackled status and wardrobe. The only other witnesses are parole officers who I think also are familiar ….

"THE COURT:  All right. At this time I'll not order that you be dressed out or unshackled; however, I'll leave the issue open if counsel can provide me with some authority that requires that.

"To be clear, if we had a jury here that would be the case, the Court wouldn't hesitate but short of that I don't—I don't see any prejudice based on the—your concern about the witnesses' testimony changing. I just don't see that."

## C.  Our Analysis

As indicated, the People concede error. We accept the concession. The court should have permitted defendant to wear civilian clothing and to be free of handcuffs in the absence of a necessity finding. Instead, the court refused to permit defendant to dress out and made no finding of necessity regarding the use of restraints.

In *People v. Zapata* (1963) 220 Cal.App.2d 903, the Third District Court of Appeal found the court erred by refusing to permit defendant to be tried before it, without a jury, in civilian clothing. (*Id*. at pp. 910-911.) That court held there were other considerations, beyond that of any potential bias by the judge, for allowing a criminal defendant to wear civilian clothing at trial, including equality before the law, psychological effects such as confusion and embarrassment on behalf of the defendant, and dignity and respect for one presumed innocent. (*Id*. at p. 911.) Like the *Zapata* court recognized, there are other considerations at play here beyond any potential influence defendant's jail garb and restraints may have on the witnesses. Defendant is presumed innocent; he should have been treated equally before the law and afforded dignity and respect free of embarrassment.

9.

A defendant, even during a bench trial, is entitled to "'the appearance, dignity, and self respect of a free and innocent man'" or "'the garb of innocence.'" (*People v. Taylor*, *supra*, 31 Cal.3d at p. 495.) Therefore, defendant's request to dress in civilian clothing should have been granted.

In *People v. Fierro* (1991) 1 Cal.4th 173, disapproved on another point in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 205-207, the California Supreme Court held a defendant should not be restrained during preliminary hearing proceedings, absent a finding of necessity. It determined the necessity rule

> "serves not merely to insulate the jury from prejudice, but to maintain the composure and dignity of the individual accused, and to preserve respect for the judicial system as a whole; these are paramount values to be preserved irrespective of whether a jury is present during the proceeding. Moreover, the unjustified use of restraints could, in a real sense, impair the ability of the defendant to communicate effectively with counsel [citation], or influence witnesses at the preliminary hearing." (*People v. Fierro*, *supra*, at pp. 219-220; see *People v. Mar*, *supra*, 28 Cal.4th at p. 1216.)

We note, too, that courts have determined the use of physical restraints on a minor during a jurisdictional hearing in a juvenile delinquency proceeding is improper absent some showing of necessity. (*In re DeShaun M.* (2007) 148 Cal.App.4th 1384, 1386-1387 [although the required showing may be less than what would be necessary in adult criminal proceedings, even in juvenile court "[a] court must not … have a general policy of shackling all defendants"]; *Tiffany A. v. Superior Court* (2007) 150 Cal.App.4th 1344, 1359 [decision to shackle minor in juvenile delinquency court must be based on the nonconforming conduct and behavior of that individual minor].)

Nothing in this record establishes a need for defendant's restraint. (*People v. Fierro*, *supra*, 1 Cal.4th at pp. 219-220; *People v. Mar*, *supra*, 28 Cal.4th at p. 1216.) Absent that need, defendant was entitled to his dignity and an ability to communicate effectively with counsel. Affording defendant those things preserves respect for the judicial system as a whole. (*Ibid*.) A preliminary hearing is similar to a bench trial in the sense a jury is not present and the judge is sitting as the trier of fact. Because the

10.

California Supreme Court applied the necessity rule to a preliminary hearing proceeding, we think it more than appropriate to presume that court would apply the necessity rule to a bench or court trial proceeding as well. Hence, because defendant was restrained during the course of the bench trial below, and in the absence of a finding that such restraints were necessary, the trial court erred. Moreover, it appears the trial court has adopted a policy of restraint where a defendant waives jury trial. This, too, is error. (*People v. Mar*, *supra*, at p. 1218.)

In light of these errors, the question then becomes whether the errors were harmless beyond a reasonable doubt, or prejudicial so as to require reversal of the conviction. (*Chapman v. California* (1967) 386 U.S. 18, 24.) We hold they were harmless beyond a reasonable doubt and do not require reversal.

In *Taylor*, the denial of civilian clothing was not harmless beyond a reasonable doubt because credibility was crucial and the defendant's account was plausible and corroborated. (*People v. Taylor*, *supra*, 31 Cal.3d at p. 500.) In *Hetrick*, too, the error was not harmless beyond a reasonable doubt because credibility was crucial, the defendant's account was plausible, and false identification was possible in the "fast moving restaurant altercation." (*People v. Hetrick*, *supra*, 125 Cal.App.3d at p. 855.) But in *People v. Pena* (1992) 7 Cal.App.4th 1294, 1306–1307, the error was harmless beyond a reasonable doubt where the defendant's credibility was crucial, but his account was "farfetched" and "almost entirely uncorroborated," and the victim's account was corroborated by physical evidence and witnesses.

In this case, like *Pena*, defendant's credibility was crucial, but his defense was "farfetched." He contended his 13-year-old daughter initiated sex with him and thus their encounters were consensual. However, there was no evidence to corroborate defendant's claim. On the other hand, Jane's account was corroborated by the testimony of Officer Alva. It was also corroborated by Bradley Rodriguez, defendant's parole agent, who testified concerning the global positioning satellite (GPS) data recorded by defendant's

11.

ankle monitor.  Additionally, the sexual assault examination conducted by Marjie Jessen was consistent with Jane's report of a rape, and thus corroborated Jane's testimony.

Further, unlike *Taylor*, no witness identified defendant as wearing "jail" clothing. In that case, witnesses referenced the defendant's "blue jail suit" and "blue county clothes."  (*People v. Taylor*, *supra*, 31 Cal.3d at p. 500.)  Rather, those that identified defendant during the bench trial all used the phrase "orange jumpsuit," but none used the word "jail" or otherwise referenced defendant's incarceration status.

Moreover, other than Jane Doe, only one "civilian" witness testified:  registered nurse and director of Forensic Nurse Specialists of Central California, Marjie Jessen. The remainder of the witnesses included law-related personnel, to wit:  Officer Alva, Detective Trukki, Agent Rodriguez, Deputy Williams, and Senior Criminalist Kyo. However, while Jessen is neither a law enforcement officer nor a criminalist, she has testified in court approximately 25 times and has been designated an expert in seven superior courts in California.  Hence, it is unlikely those witnesses other than Jane, because all are familiar with the judicial system and their obligations related thereto, would be "swayed" by defendant's orange jumpsuit and handcuffs.

The *Chapman* standard of prejudice applies to any error in requiring a defendant to appear at trial in visible physical restraints.  (*Deck v. Missouri*, *supra*, 544 U.S. at p. 635; *Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Ceniceros* (1994) 26 Cal.App.4th 266, 278-281.)  "To find the error harmless [this court] must find beyond a reasonable doubt that it did not contribute to the verdict, that it was unimportant in relation to everything else the [factfinder] considered on the issue in question."  (*People v. Song* (2004) 124 Cal.App.4th 973, 984; see *Yates v. Evatt* (1991) 500 U.S. 391, 403–404.)

On this record, it is plain the error was harmless.  Defendant's defense was ludicrous.  Caught in the act of defiling his 13-year-old daughter, defendant crafted a defense whereby their encounter was consensual because he could not stop himself from giving in to her wants and desires.  In his interview with detectives defendant complained

12.

his daughter was the aggressor. She was being flirtatious, "buttering" him up and telling him he was "the most handsomest guy ever." "[S]he had [him] in her fuckin' world at that moment …," was "coming on to" him, was "getting her way with [him], and … she just ha[d him] with her mind, she ha[d]" him "wrapped up in her … web."

In that same interview, defendant also claimed the photos of his daughter's breasts and genitalia found on his cell phone were taken not by him but by his daughter and her friend; she wanted to sell the photos for money and she laughed about taking them. He claimed he was not aroused by the pictures, but he laughed because "she was being such a horny ass." Defendant claimed his daughter was lying about being forced to have sex with him because "she's like crazy possessive" and did not like it when he told the arriving officer that he did not know her. He also claimed Jane's mother "would flip out if she knew that fuckin' [Jane] wanted [him]" because Jane's mother is "in love with [him] too" and has never gotten over him. Defendant denied giving Jane a hickey and said that Jane told him her mother had "socked her" and caused the mark, and that Jane's mom is "always whipping her ass." The record, however, is lacking evidence to corroborate defendant's claims.

On the other hand, Jane's account—that none of the acts was consensual—was corroborated by the testimony of Alva, Rodriguez, Jessen, Kyo, and Trukki. Alva's testimony reveals defendant was "sweating profusely," nervous, tense, and refused to look at her. At one point, he was rocking back and forth, "nervous like." Defendant initially denied having sex with Jane, claiming he did not know her and had just met her. Alva also indicated defendant was telling the car's occupant not to talk to her. Shortly after Alva learned Jane's true identity, defendant jumped up from the curb where he had been instructed to sit and, although handcuffed, attempted to flee the scene. Defendant's actions support Jane's testimony that the encounters were forced. Alva further testified Jane "looked scared" upon her arrival, and that as Alva spoke with her, Jane became more upset and began to cry.

13.

Next, Marjie Jessen conducted a sexual assault examination of Jane. Jessen's findings were consistent with Jane's report of a rape, and thus corroborated Jane's testimony. An example of the record corroborating Jane's account and directly contradicting defendant's story is the physical evidence of a hickey on Jane's left breast. Jane testified defendant gave her a hickey in the park restroom. Conversely, defendant told detectives Jane told him her mother had "socked her" in the breast, causing the injury. Jessen's examination revealed a suction injury, otherwise known as a hickey, on Jane's left breast. DNA swabs were taken of that area and subsequent testing revealed the suction injury site contained a "low-level DNA mixture" consistent with one male contributor.[4] Moreover, that sample did not contain "any allele or genetic information" foreign to defendant.

With specific regard to defendant's claim that he did not take the sexually explicit photographs or the video of his daughter found on his cell phone, defendant's statement was contradicted in part by the testimony of Detective Trukki. Trukki testified that a video clip depicting Jane masturbating was taken at the same time photographs of Jane were taken. The audio associated with the video clip reveals a male voice whispering in the background, although the specific words cannot be discerned. This evidence corroborated Jane's testimony that defendant forced her to pose nude and masturbate while he took the photographs in the park restroom. Significantly, too, a man's hands or fingers can be seen in several of the cell phone photos taken of Jane's vagina. Jane identified them as belonging to defendant.

Jane's account was corroborated in other ways as well. For example, Bradley Rodriguez, defendant's parole agent, testified concerning the GPS data recorded by defendant's ankle monitor. More particularly here, Rodriguez testified about the various locations collected during the relevant time period encompassing the assaults. For

_____

[4]The DNA swab of Jane's right breast yielded more genetic information. Defendant was the major contributor to the DNA left on Jane's right breast.

14.

example, Jane testified she and defendant were at the park for about 15 to 20 minutes. Rodriguez's testimony revealed the GPS monitor placed defendant at the park between 7:36:05 p.m. and 7:56:06 p.m., a period of 20 minutes, corroborating Jane's account.

In sum, considering the entire record, although the trial court erred in denying defendant's request to wear civilian clothing and to be free of restraints at his bench trial, the errors were harmless beyond a reasonable doubt. The evidence of defendant's guilt was significant and compelling. In light of the overwhelming evidence of defendant's guilt, his jail garb and restraints during the bench trial did not contribute to the guilty verdicts. Reversal is not warranted.

## II. Waiver of the Right to Jury Trial

Next, defendant asserts he did not knowingly and intelligently waive his right to a jury trial because the court did not inform him he would also be giving up his right to be free from restraints and jail clothing during the bench trial.

Although the right to a trial by jury is fundamental under both the federal and state Constitutions, the right may be and is commonly waived, so long as the waiver is express, knowing, intelligent, and voluntary. (*People v. Collins* (2001) 26 Cal.4th 297, 304–305; *Duncan v. Louisiana* (1968) 391 U.S. 145, 148–150, 157–158; see U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) An express waiver is knowing, intelligent and voluntary when the defendant is fully aware of the nature of the right he is giving up and the consequences of doing so, and it is the "'''"product of a free and deliberate choice rather than intimidation, coercion, or deception.'''" [Citation.]" (*Collins*, *supra*, at p. 305.) A waiver taken after the trial court has offered a benefit, or even just the possibility of an unnamed future benefit, is not voluntary. (*Id.* at pp. 309–312.) A waiver must be made by the defendant in open court and may not be implied. (*People v. Martin* (1980) 111 Cal.App.3d 973, 979.)

### A. The Relevant Proceedings

During jury selection, when proceedings resumed on the afternoon of October 3, 2012, the following exchange occurred outside the presence of the prospective jurors:

15.

"[DEFENSE COUNSEL]:  At this time, speaking with my client at lunch and right now, um, he'd like to waive jury trial.  And just to be quite honest, his decision is twofold in not having to put the public through this, as well as not having [Jane] be exposed to the public viewing images and what happened on that day.

"So we request to waive a jury trial and if we can come back on Tuesday to start proceedings.  … And that's his request today. [¶] … [¶]

"THE COURT:  All right.  [Defendant], let's talk to you for a moment. You've heard all the discussions of Court and Counsel.  And I understand in this matter you've made a decision, you've asked Counsel if you can waive a jury trial in this case; is that correct?

"THE DEFENDANT:  Yes, sir.

"THE COURT:  You understand in this matter you do have a right to be tried by 12 jurors.  And that right is we're proceeding today to pick that jury to hear this matter; do you understand this right?

"THE DEFENDANT:  Yes.

"THE COURT:  And that if the jury is not convinced that the People have proved their case beyond a reasonable doubt, you are entitled to have the jury acquit you of the charges; you understand this?

"THE DEFENDANT:  Yes.

"THE COURT:  You understand that this waiver is unconditional: once you waive a jury trial, the Court's not going to allow you to withdraw that waiver, unless there's been some extraordinary circumstances like fraud or something else, which I don't think is the case.  Do you understand you will not be able to be allowed to withdraw that waiver?

"THE DEFENDANT:  Yes.

"THE COURT:  So that this trial will proceed without a jury, and the Court will listen to evidence and listen to arguments and make a decision in this matter; do you understand this?

"THE DEFENDANT:  Yes.

"THE COURT:  Now, we have a jury panel that's available, and we can proceed today in picking that jury; you understand this?

"THE DEFENDANT:  Yes.

16.

"THE COURT: You wish to waive your right to a jury so that we can send these folks home?

"THE DEFENDANT: Yes.

"THE COURT: All right. Then let me ask you, you give up your right to have a jury trial in this matter as it relates to all the charges that are listed in the Information that's been read to the Court, as well as the prior conviction allegations and the serious and violent felony prior allegations?

"THE DEFENDANT: Yes.

"THE COURT: And Counsel, do you concur in this waiver?

"[DEFENSE COUNSEL]: Yes, I do, Your Honor.

"THE COURT: And do the People waive their right to the jury trial?

"[PROSECUTOR]: Yes.

"THE COURT: In this matter, I find the defendant has knowingly, intelligently, freely, voluntarily, and understandingly waived his right to a jury trial, and we'll proceed with a court trial in this matter."

## B. Our Analysis

Defendant gave up his right to a jury trial in favor of a court trial, in part, to save his daughter the embarrassment of a more public proceeding. After his waiver and before the court trial began, defendant learned the trial court would not permit him to wear civilian clothes and be free of restraints.

"[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." (*United States v. Ruiz* (2002) 536 U.S. 622, 629.) "There is no constitutional requirement that appellant understand 'all the ins and outs' of a jury trial in order to waive his right to one." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1105.)

The record reveals defendant knowingly and intelligently waived his right to have 12 jurors decide the case, and he understood that if the People did not convince those 12

17.

people of his guilt beyond a reasonable doubt, he would be entitled to an acquittal. He understood the judge would be listening to the evidence and arguments and rendering the decision concerning his innocence or guilt. Hence, he understood the nature of his right and how it applied generally, although he did not know the specific consequences involved: that the court would deny his request to wear civilian clothing and to be free of restraints. In fact, the court could not have advised defendant where defendant had not yet made his requests known.

As noted in *People v. Smith* (2003) 110 Cal.App.4th 492, 500, there is no requirement for "'a specific formula or extensive questioning beyond assuring that the waiver is personal, voluntary and intelligent. [Citations.]' (*People v. Castaneda* (1975) 52 Cal.App.3d 334, 344.)" In effect, defendant's argument that his waiver was not knowing and intelligent in the absence of information not yet known is a request that we require extensive questioning into various procedures related to a trial generally and anticipated differences between a jury trial and a court trial, from that court's perspective. We will not require such extensive questioning.

Moreover, the right to wear civilian clothing and be free of restraints during trial relates to the fairness of the trial, rather than whether defendant's waiver of his right to a jury trial was voluntary and knowing. (E.g., *United States v. Ruiz*, *supra*, 536 U.S. at p. 629 ["impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*"].)

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." (*Johnson v. Zerbst* (1938) 304 U.S. 458, 464.) In light of the fact there is little authority addressing a defendant's right to civilian clothing when tried by the court and a lack of restraints absent a finding of necessity when tried by the court, it can be said defendant was not asked to relinquish a *known* right or privilege by virtue of his waiver in this case.

The court's subsequent denial of defendant's request to wear civilian clothing and be free of restraints had no significant bearing on defendant's prior understanding of the

18.

nature of the right to a jury trial and how waiving that right would apply in general. In sum, given these circumstances, we find defendant's waiver of his right to a jury trial was voluntary, knowing, and intelligent. Reversal is not required.

## III.   Defendant's Statement and Its Admission

Defendant contends the trial court erred by failing to exclude evidence of his statement to police because he unequivocally invoked his *Miranda* rights. We do not agree.

### A.    Legal Standards

In reviewing a trial court's ruling in a case such as this, we """"accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]""" (*People v. Crittenden* (1994) 9 Cal.4th 83, 128, quoting *People v. Johnson* (1993) 6 Cal.4th 1, 25, overruled on other grounds in *People v. Rogers* (2006) 39 Cal.4th 826, 879; see *People v. Boyer* (1989) 48 Cal.3d 247, 263, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) Where the facts are undisputed, we independently determine whether the defendant unambiguously invoked the right to counsel. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

In *Miranda*, *supra*, 384 U.S. 436, the United States Supreme Court adopted a set of prophylactic measures to protect the Fifth Amendment right against self-incrimination from the "inherently compelling pressures" of custodial interrogation. (*Miranda*, at p. 467.) To counteract the coercive pressure, police officers are required to warn a suspect prior to questioning that the suspect has the right to remain silent and a right to the presence of an attorney. (*Id*. at p. 444.) After the warnings are given, if the suspect requests counsel at any time during the interview or indicates that he or she wishes to remain silent, the suspect shall not be subject to further questioning and the interrogation

19.

must cease until a lawyer has been made available or the suspect reinitiates conversation. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484–485.)

A suspect may waive the right to remain silent and the right to have an attorney present. (*Maryland v. Shatzer* (2010) 559 U.S. 98, 104.) The standards are the same as to both Fifth and Sixth Amendment rights. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381-382.) Once a suspect has waived his or her *Miranda* rights, any subsequent assertion of the right to counsel or to remain silent must be articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis v. United States* (1994) 512 U.S. 452, 459.) When a suspect makes an ambiguous or equivocal statement, or makes no statement after admonishment, it is often good police practice for the interviewing officers to clarify whether the suspect wants an attorney. (*Id*. at p. 461.) Yet, the police are not required to end the interrogation. (*Berghuis v. Thompkins*, *supra*, at pp. 381-382.)

"'[T]he rule that interrogation must cease because the suspect requested counsel does not apply if the request is *equivocal*; "[r]ather, the suspect must *unambiguously* request counsel."'" (*People v. Davis* (2009) 46 Cal.4th 539, 587, citing *People v. Sapp* (2003) 31 Cal.4th 240, 266, quoting *Davis v. United States*, *supra*, 512 U.S. at p. 459.) Whether a suspect has invoked the right to counsel is an objective inquiry. (*Davis v. United States*, *supra*, at p. 459.) If a suspect makes reference to an attorney that is ambiguous or equivocal such that a reasonable officer in light of the totality of the circumstances would have understood only that the suspect might be invoking the right to counsel, immediate cessation of questioning is not required. (*Id*. at pp. 459, 461–462; *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1124–1125.)

## B.    The Interview[5]

In relevant part, at the commencement of defendant's interview by detectives, the following colloquy took place:

> "[DETECTIVE TRUKKI]:  Well uh, Detective (Garibay) kind of filled me in a little bit about what happened last night, so, I handle all the uh, sexual assault, sexual abuse investigations in the City of Madera, so that's why I'm here.  So I wanted to talk to you and get your side of the story, 'cause I read uh, the report and I read what your daughter … has told um, the other officer, Officer (Alva), so I wanted to get your version.  Uh, but before I do that I'm gonna have to share your rights with you real quick.  You have the right to remain silent.  Do you understand?

> "[DEFENDANT] A:  Yeah.

> "Q:  Yes?  Okay.  Anything you say can be used against you in court.  Do you understand?

> "[DETECTIVE GARIBAY]:  Yes?

> "[DETECTIVE TRUKKI]:  You have to say yes or no.

> "A:  Yes.

> "Q:  Okay.  Uh, you have the right to the presence of an attorney before and during any questioning.  Do you understand?

> "A:  Yes.

> "Q:  Okay.  If you cannot afford to hire an attorney, one will be appointed for you free of charge before questioning.  Does that make sense?  Do you have any questions about that?

> "A:  Where's the attorney at?  You guys are gonna have one here while you guys talk to me?

> "[DETECTIVE GARIBAY]:  Uh, well …

> "A:  Before questioning me?

> "[DETECTIVE GARIBAY]:  … go ahead.

---

[5]We have listened to the audio recording of defendant's interview with detectives referred to in the record as People's exhibit No. 8.

"[DETECTIVE TRUKKI]:  Well …

"A:  It says one will be appointed to me before questioning.

"[DETECTIVE TRUKKI]:  Well let me read your rights again real quick …

"A:  Yeah.

"[DETECTIVE TRUKKI]:  …so you understand them.  You have the right to remain silent, okay.  And you said you understood that, right?  Uh, anything you say may be used against you in court.  You said you understood that.  Uh, you have the right to the presence of an attorney before and during questioning.  You said you understood that, okay.

"A:  That's what I'm talking about.

"Q:  Right.  And it said if you could not afford one, one will be appointed for you free of charge.

"A:  Okay.

"Q:  But that's—normally you don't get one appointed until you go to your arraignment, which is not until uh, tomorrow.

"[DETECTIVE GARIBAY]:  So—so I guess the question is, uh, knowing—knowing your rights in mind, that you could have an attorney present or not, um, and if you're willing to tell us, uh, we—we're here to listen, but if you want your attorney present, we understand.

"A:  I understand.  I just don't want to incriminate myself, but I don't think there's any way I could, you know.

"[DETECTIVE GARIBAY]:  Let's—let's …

"[DETECTIVE TRUKKI]:  What—what do you mean by that?

"[DETECTIVE GARIBAY]:  … let's get back to that.  Does he understand it?

"[DETECTIVE TRUKKI]:  Well, yeah.

"[DETECTIVE GARIBAY]:  Okay.

"[DETECTIVE TRUKKI]:  Yeah, before we go any further I just want to—to make sure you understand your rights, so …

"A: I believe so.

"[DETECTIVE TRUKKI]: Okay. So at this point are you willing to answer our questions without the presence of an attorney? I mean that's as black and white as I could put it.

"A: Well, it depends on how you—how you state your questions, because I don't want to go and answer some questions and it's a yes or no answer.

"[DETECTIVE GARIBAY]: Well you don't …

"A: 'Cause there's—there's details to everything, you know, and there's uh, there's certain emotions and understandings that go on.

"[DETECTIVE TRUKKI]: Okay.

"A: With—with this in particular 'cause it's my daughter, and …

"[DETECTIVE TRUKKI]: Right. [¶] … [¶] Okay. And we'll get— let's do this. At any time you can exercise your rights, meaning at any time you could say, 'Nah, I don't want to talk to you anymore,' or, 'I want a lawyer.' But right now, before we go further, I need you to say, 'Yes, at this point I'm willing to talk to you without my attorney.' Is that true and correct or not?

"A: Yes.

"[DETECTIVE TRUKKI]: Okay. All right. Well that's very fair then.…"

At trial, defense counsel argued defendant's statement should be suppressed because defendant unequivocally invoked his right to be represented by an attorney during questioning. After carefully considering counsel's argument, the court was not persuaded:

"THE COURT: All right. Well, I don't believe it's unequivocal at this point. It doesn't appear to the Court that he's asking for an attorney. It appears as though he's trying to understand his rights, what are they telling him. If I have a right to an attorney where's the attorney at. He's not saying I want an attorney just saying where, you know. Where is he at. [¶] … [¶]

23.

"… All right. The Court will allow—will deny the motion to exclude based on failure to provide Miranda warnings and/or receive a waiver. I believe the defendant has waived."

## C. Analysis

Defendant's questions and statements in response to being advised of his right to the presence of an attorney at the time of questioning amount to procedural inquiries rather than unequivocal requests for the presence of counsel during questioning.

> "In *Davis v. U.S.*, [*supra*,] 512 U.S. 452 (*Davis*), the United States Supreme Court explained that to invoke the *right to counsel* during an interrogation, a suspect must 'articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' (*Id*. at p. 459.) 'If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.' (*Id*. at pp. 461–462.) Although 'when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney,' the high court specifically declined to adopt a 'stop and clarify' rule that would require officers to ask clarifying questions about whether the right was being invoked. (*Id*. at p. 461.)" (*People v. Martinez* (2010) 47 Cal.4th 911, 947.)

We have listened to the audio recording of the interview. In context and tone, defendant's questions "[w]here's the attorney at?" and "[y]ou guys are gonna have one here while you guys talk to me?" reflect defendant's apparent misunderstanding that an attorney was waiting in the wings, so to speak, to act as counsel for anyone being questioned by police at any given time. In light of his questions, the detectives repeated the admonition to be sure defendant understood he had the right to the presence of an attorney, and that if he could not afford one, the court would appoint an attorney to represent him. When he replied, "That's what I'm talking about," the detectives clarified the procedure. They explained, too, that if he wished to have an attorney represent him during their questioning, one would be appointed at his arraignment the following day. Defendant stated he understood. He then went on to say that he did not believe he could incriminate himself in any event. When defendant indicated that whether he was willing

24.

to answer their questions without an attorney present depended upon how the detectives intended to ask their questions, the detectives again sought to clarify his understanding of the advisements. Ultimately, in context and in tone, defendant replied affirmatively to Detective Trukki's question, asking whether defendant was willing to talk to the detectives without an attorney.

At no time did defendant say he wanted an attorney present during questioning. None of his comments can be reasonably interpreted to be an unequivocal request for counsel. Asking "where" does not equate to an unequivocal "want." Further, defendant's "it depends" reply in response to the detective's question "are you willing to answer our questions without the presence of an attorney" was conditional and, thus, ambiguous and equivocal. (*People v. Suff* (2014) 58 Cal.4th 1013, 1068-1069, citing *People v. Gonzalez* (2005) 34 Cal.4th 1111.) When faced with defendant's ambiguous statements, the detectives sought to clarify, on more than one occasion, whether defendant wanted an attorney present. Such a tactic has been identified as "a good police practice." (*Davis v. United States*, *supra*, 512 U.S. at p. 461; *People v. Martinez*, *supra*, 47 Cal.4th at p. 947.) That practice did not yield an unequivocal response from defendant here.

A reasonable police officer would not have concluded defendant's questions "[w]here's the attorney at?" and [y]ou guys are gonna have one here while you guys talk to me?" to be a request for counsel. (E.g., *Davis v. United States*, *supra*, 512 U.S. at pp. 461–462 [defendant's statement "'Maybe I should talk to a lawyer'" held equivocal]; *People v. Stitely* (2005) 35 Cal.4th 514, 534–536 [defendant's statement "'I think it's about time for me to stop talking'" not sufficiently unequivocal to invoke right to silence]; *People v. Suff*, *supra*, 58 Cal.4th at pp. 1068–1069 [defendant's statement "'if I'm being charged with this I think I need a lawyer'" held equivocal and conditional and therefore insufficient to invoke right to silence]; *People v. Gonzalez*, *supra*, 34 Cal.4th at pp. 1119, 1126 [defendant's statement "'if for anything you guys are going to charge me I want to talk to a public defender too'" was conditional "on its face" and therefore was

"at best, ambiguous and equivocal"]; *People v. Roquemore* (2005) 131 Cal.App.4th 11, 25 ["'can I call a lawyer or my mom to talk to you?'" held equivocal].)

Here, taking circumstances in context, including defendant's language and tone, defendant failed to objectively communicate an unequivocal right to remain silent. (See *People v. Whitson* (1998) 17 Cal.4th 229, 249; *People v. Clark* (1993) 5 Cal.4th 950, 992, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn 22.) Because there was no violation of defendant's *Miranda* rights, we need not address his arguments concerning prejudice as a result of the admission of his statements.

In sum, in light of defendant's ambiguous and equivocal statements following the advisement of his right to the presence of an attorney during questioning, the detectives were not required to end the interrogation because no reasonable officer would have concluded defendant's statements were an unequivocal request for counsel. Defendant's rights were not violated. Therefore, the trial court did not err in admitting into evidence defendant's statement to law enforcement.

## IV.    *Trombetta/Youngblood*—Ineffective Assistance

Defendant argues he was denied the effective assistance of counsel because counsel successfully excluded evidence that police were aware of the nature of destroyed evidence, and because counsel failed to pursue a theory that the evidence was destroyed in bad faith. We find the nature of the evidence was not known, and there was no substantial evidence of bad faith.

### A.    Legal Standards

To prevail on an ineffective assistance of counsel claim, the appellant must establish two things: (1) counsel's performance fell below an objective standard of reasonableness, and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105; *People v. Bradley* (2012) 208 Cal.App.4th 64, 86–87.) The *Strickland* court explained that prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*, at p. 694.)

26.

Further, the high court stated that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding.  (*Ibid*.)

""""Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission."'  [Citation.]"  (*People v. Lucas* (1995) 12 Cal.4th 415, 437.)  If the record on appeal """"sheds no light on why counsel acted or failed to act in the manner challenged[,] … unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected,'" and the "claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

> "The constitutional due process rights of a defendant may be implicated when he or she is denied access to favorable evidence in the prosecution's possession.  (*Brady v. Maryland* (1963) 373 U.S. 83.) [*California v*. ]*Trombetta* [(1984) 467 U.S. 479] outlines how the state's failure to preserve evidence may violate those rights.  In *Trombetta*, the high court limited the state's affirmative duty to preserve evidence to that which 'might be expected to play a significant role in the suspect's defense.' (*Trombetta*, *supra*, 467 U.S. at p. 488.)  This standard of 'constitutional materiality' imposes two requirements that a defendant must meet in order to show a due process violation.  As an initial matter, the evidence must 'possess an exculpatory value that was apparent before [it] was destroyed.' (*Id*. at p. 489.)  Additionally, it must 'be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' (*Ibid*.)  [¶] … [¶]

> "Destroyed evidence with only potential, rather than apparent, exculpatory value is without remedy under *Trombetta*, but [*Arizona v*.] *Youngblood* [(1988) 488 U.S. 51] provides a limited remedy when the state has acted in bad faith in failing to preserve the evidence.  In *Youngblood*, police obtained semen samples from a rape kit and several items of clothing, but could not definitively establish the identity of the assailant through their initial tests.  (*Youngblood*, *supra*, 488 U.S. at pp. 52–54.)  The police subsequently failed to take measures necessary to preserve those samples, such as refrigerating the clothing.  (*Id*. at p. 54.)  Although properly preserved samples could have exculpated the defendant in that case, that evidence was only 'potentially useful' (*id*. at p. 58) to the defense and not '"potentially exculpatory"' at the time it was allowed to deteriorate

(*id*. at pp. 57–58). The court held that 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' (*Id*. at p. 58.)" (*People v. Lucas* (2014) 60 Cal.4th 153, 221-222.)

"We review the trial court's decision on a *Trombetta/Youngblood* motion under the substantial evidence standard. (*People v. Montes* (2014) 58 Cal.4th 809, 837.)" (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 774.)

## B. The Relevant Proceedings

Prior to the commencement of trial, on October 1, 2012, defense counsel advised the court that evidence may have been deleted from defendant's cell phone, allegedly by the victim in response to a request by officers at the time of her interview to turn off defendant's cell phone. At that time, it was not yet known whether images had in fact been deleted from defendant's phone. The matter was being looked into.

On October 3, 2012, an Evidence Code section 402[6] hearing was held on the issue. Julie Williams, a detective with the Fresno County Sheriff's Office, Internet Crimes Against Children Task Force testified. The detective is trained in cell phone data extraction. To determine whether data had been deleted from defendant's cell phone, she employed two tools: the Cellebrite and the XRY data extraction tools. However, neither tool's format supported an analysis of defendant's brand of cell phone. As a result, it was not known whether data had been deleted. And, if any data had been deleted, it could not be recovered. Following Detective Williams's testimony, the court summed up: "All right. So, basically, the information I have regarding this issue so far is, there may or may not be data, and there may or may not be items that were deleted."

At trial, during the cross-examination of Officer Alva, the following occurred:

---

[6]Subdivision (b) of Evidence Code section 402 provides, in part: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury."

"[DEFENSE COUNSEL]: And you mentioned some—when you took [the victim] to the police station, um, you asked her for her mom's number? Correct?

"A Yes.

"Q And she could not provide that to you initially?

"A No, initially, she did not provide it to me.

"Q And where'd you say that number was located at?

"A I don't recall where. If she remembered it or if she pulled it out of the phone because I did give her the phone temporarily.

"Q Whose phone was that?

"A It was [defendant]'s phone.

"Q And how did you get in possession of that phone?

"A It was in the vehicle.

"Q Where at? Where at in the vehicle?

"A I'm not sure. I didn't retrieve it, it was handed to me.

"Q And so you gave her the phone to find the number of her mom, her mom's number?

"A No, initially—well, I looked through the phone because en route … she told me that he had taken some pictures of her nude. So I looked at the images with Detective Garibay when she indicated that there w[ere] some nude photos of her and other photos of her.

"[DEFENSE COUNSEL]: Objection. Nonresponsive, Your Honor. Motion to strike.

"THE COURT: Sustained after no, initially.

"BY [DEFENSE COUNSEL]:

"Q So you did give her the phone at a certain point, correct?

"A Yes.

"Q And when you gave her that phone were you with her?

29.

"A  No, I was right outside the room about four feet away.

"Q  And you were there and Detective Garibay was nearby; is that correct?

"A  He was right face to face with me.

"Q  And do you recall him asking you to come out of the room while Jane Doe had the phone?

"A  Yes.

"Q  Okay.  And that conversation between you and Hector Garibay how long do you think that lasted?

"A  Maybe 30 seconds.

"Q  Okay.  And you had asked her to turn the phone off?

"A  Yes."

The issue of defendant's phone and Jane's access to it came up again during Jane's direct examination:

"[PROSECUTOR]:  At some point did you end up at the Madera Police Department?

"A  Yes.

"Q  And did you sit in a room and talk to Officer Alva?

"A  Yes.

"Q  And did you tell her what had happened to you?

"A  Yes.

"Q  At the end of that conversation—well, do you know where your father's cell phone was during that time?

"A  The officer had it.

"Q  Officer Alva had it?

"A  Mmm-hmm, yes.

"Q  And at the end of that conversation that you had with Officer Alva, at some point did you have the phone?

30.

"A  Yes.

"Q  How did that happen?

"A  Um, I grabbed it from the table, I think.  Um, not too sure.

"Q  Do you know why you grabbed it from the table?

"A  I wanted to call my mom.

"Q  At some point did you look at the photos that were on it?

"A  It was already on there.  Like, I opened it and it was already on photos.

"Q  Do you remember where Officer Alva was when you opened it and it was already on photos?

"A  She was right outside the door talking to another officer.

"Q  And what's the next thing that you remember?

"A  I logged out—well, didn't log out, I got out of the pictures and went to the contacts.

"Q  And why did you go to the contacts?

"A  I wanted to get my mom's number for some reason I thought he would have my step dad's or my—no one uses my house phone besides me so I couldn't call that.

"Q  And did you know your mom's cell phone number?

"A  No.

"Q  Did you find your mom's number or your step dad's number?

"A  No.

"Q  What was the next thing that happened?

"A  I just gave the phone to them.

"Q  Did they ask you how to turn it off?

"A  Yeah.

"Q  And were you able to show them that?

31.

"A  Yes.

"Q  Did you delete anything off of the phone?

"A  Not that I could remember."

On cross-examination, Jane testified as follows:

"[DEFENSE COUNSEL]:  And [Officer Alva] asked you about how to get in contact with your parent; is that true as well?

"A  Yes.

"Q  And you didn't know, did you not know?

"A  I don't.

"Q  How do you usually get a hold of your mom?

"A  I don't.

"Q  You never call her?

"A  No.

"Q  You never called your mom once?

"A  Not at work.

"Q  At work.  Does she have a cell phone?

"A  Yeah, but they're not allowed to have cell phones at her job.

"Q  Okay.  So when[] she's not working you never called her before?

"A  Yes, I have.

"Q  Okay.  And how would—where is that number at?

"A  Um, it was at home on my piece of paper I had on my table.

"Q  And then you're trying to get a hold of your step dad, too?

"A  Yeah, I figured he might come get me.

"Q  How do you—you didn't know his number?

"A I don't really get along—at the time I didn't get along with him so I wouldn't have his number ever.

"Q Okay. So you don't when you're out and about you don't ever have to call home or your mom or your step dad or anything?

"A No.

"Q Okay. So they give you the phone, Officer Alva does, correct?

"A Yes.

"Q She tells you to turn the phone off?

"A Yes.

"Q Had you ever used that phone before that day?

"A Yes.

"Q And so you kind of know how it works?

"A Yes.

"Q Is it a touch phone?

"A Yes, I believe so.

"Q And do you know how to turn it off?

"A Yes.

"Q How would you, do you remember how to do that, it's been a couple years?

"A It's either you hold one of the buttons down. I think if you hold one of the buttons down.

"Q Maybe the top button?

"A I think so.

"Q Okay. So, when she asked you to turn the phone off you knew how to do that?

"A Yes.

33.

"Q  And so she gives you the phone she tells you to turn the [phone] off, but [you] don't do that, do you?

"A  No.

"Q  What do you do?

"A  I was looking like hoping that he had my mom's number somehow.  And I was looking for my mom's cell phone number and if not like my step dad's.

"Q  And did you find them?

"A  No.

"Q  And when the district attorney asked you if you deleted anything you said not that you remember.

"A  Yeah.

"Q  What do you mean by that?

"A  I don't know if I did.

"Q  So you might have deleted some stuff?

"A  Not a picture, I don't—I don't know if I deleted anything.

"Q  But maybe you deleted some messages or something like that or phone calls?

"A  No.

"Q  No.  So what did you delete?

"A  I don't remember.  Like, I know I was looking for something but I didn't want to say I didn't delete anything or I did because I don't remember.

"Q  Okay.  If you—if you had not deleted anything would you have remembered that?

"A  Yes.

"[DEFENSE COUNSEL]:  Okay.  If I can have a moment, Your Honor?

"THE COURT:  Yes.

34.

"THE WITNESS:  Can I answer that question again.

"THE COURT:  Hold on just a second, ma'am.

"BY [DEFENSE COUNSEL]:

"Q  Why did you use—

"THE COURT:  Hold on just a minute.  [¶] You want to clarify your last answer; is that correct?

"THE WITNESS:  Yes.

"THE COURT:  Go ahead.

"THE WITNESS:  I don't know if [*sic*] would remember if I deleted anything if I had not.

"BY [DEFENSE COUNSEL]:

"Q  What do you mean by that?

"A  I don't know if [*sic*] would remember.  I'm not sure if I would remember if I did or if I didn't."

On redirect, Jane was asked if she intended to delete anything while she had defendant's phone at the police station.  She replied, "No, not that I could remember."  When next asked, "Would you remember if you had intended to delete something?" she replied, "Yes."

Detective Williams testified at trial on October 15, 2012, nearly two weeks after the Evidence Code section 402 hearing.  During the period between her earlier testimony and her testimony at trial, the detective had an opportunity to subject defendant's cell phone and the issue of deleted data to further analysis.  Although she was unable to extract any deleted data from the phone, Williams believed data had in fact been deleted from defendant's phone based upon "the file names of the images" and the associated ordinal number.  Based upon that naming and numbering, it appeared nine photographs and one video clip had been deleted.  Detective Williams acknowledged or verified the photos admitted as People's exhibits 4 and 5, and identified as the 10th through 19th photos taken on the relevant date between the hours of 7:38 and 7:52 p.m., were present

35.

on defendant's cell phone. Additionally, the detective testified that the phone contained one video taken during that same time period; its naming sequence indicates it was the second video taken on that date.

When the defense rested its case, the following argument was heard before the court:

> "[DEFENSE COUNSEL:] In this case there is an issue, of course, with the cell phone. Today we just learned that from Ms. Williams that there was deleted information. It was pictures 1 though 8 in addition to that there was also a video that was deleted. Video number one. And that is, of course, new information that wasn't gleaned from the [Evidence Code section] 402 hearing but I believe Ms. Williams did some further research. Second there was also testimony from Officer Alva that the witness after Officer Alva had the phone in her possession let the witness use the phone for whatever reason to call somebody to turn the phone off and she had the phone for several minutes. And I believe the witness, I believe witness Jane Doe also testified that she had that phone that she had that phone that day after the police had it for at least on these two separate occasions while being interviewed by Officer Alva and that she was alone. And well, at least on one case Officer Alva was no longer watching Jane Doe with the phone. She briefly left the room and talked to Officer Garibay. When asked, Jane Doe, I asked her regarding that phone whether information has been deleted. I believe I'd be paraphrasing but something to the effect, I do not recall if I deleted any video. Um, she testified—and I don't believe on many occasions at all during her testimony, the Court would I know took notes—that she used those words very often, I don't recall or I mean not sure. She was fairly positive about most things and then some other things once it was brought to her attention she remembered and then said, oh yes, I forgot.
>
> "We asked her specifically over and over again whether she deleted information and she cannot remember whether she did or whether she didn't. And I would surmise to the Court, that I believe in terms of credibility, I believe she did delete information from that phone. And it's— and it's obvious now that we have that information from Ms. Williams that there was testimony that Item 0 through 9 were deleted and video one was deleted. I think Jane Doe would have remembered if she did not delete any information from that phone. It's something very clear and shouldn't take a lot of reflection either you did or you didn't. I think she's being extraordinary [*sic*] evasive. And the Court can judge her credibility in terms of that.

36.

"In terms of the law, it's either the defendant can establish that the prosecution acted in bad faith in destroying, which I don't believe is the case here, or failing to preserve evidence that person is still entitled to relief on a showing that there is loss or destroying evidence that might have exonerated him or her. And I believe the second prong is which is applicable in this case. I believe that at this time Officer Alva had that phone in her possession it belonged to them. It was evidence. They allowed Jane Doe to exam[ine] that phone to look at that phone. Essentially, tampered with the evidence, manipulate that evidence and I believe that there is information that might exonerate my client not of all charges but I believe would exonerate him of the force of rape, as well as also in that essence the kidnapping. What those photos are, we don't know and that's the point. I believe that if she deleted anything it was exculpatory. She did not know she deleted anything, she couldn't remember.

"THE COURT: On what basis do you believe it's exculpatory if you don't know what it is?

"[DEFENSE COUNSEL]: Well, I don't see any other reason why Jane Doe would—would delete any of that information. She had already given her statement to the police. Any other pictures she could have deleted perhaps would show that her statements were falsified in some manner. She didn't delete all the photos, the photos that implicated my client …. She couldn't remember, and I believe the key fact, in my opinion, is that she could not remember if she deleted photos or not. I believe that's something that's plainly obvious. We'd all remember if we went through a phone and deleted it. She's able to remember a lot of minute details that day. And I believe that evidence might have exonerated [defendant] if it shows consent. And I believe those were the types of photos that were deleted on that phone that day. And I believe she had access to it, it's fairly obvious. [¶] And submit it to the Court.

"THE COURT: All right. The People's response?

"[PROSECUTOR]: My understanding of (Jane Doe's) testimony was somewhat different than the defense's. I recall asking her fairly pointedly whether or not she intended to delete information from that phone and her response to that was no. My understanding of the equivocal nature of her responses with regard to whether or not she deleted data referred to her own unfamiliarity with that particular phone. Officer Alva testified that they handed it to—they handed the phone to (Jane Doe) with the request that she turn it off and it [t]ook her sometime to figure that out; that further indicates an unfamiliarity with the phone.

37.

"Also, I would note if the Court compares with regard to the evidence before it, understanding that we don't have any demonstration that the time on the phone that the photos were date and time stamped is accurate. I do note that the photo stamped item 10 ordinal numeral ten, the first photograph admitted in this case was GMT time stamped at 2:38 on the 23rd which would have been 7:38 in the evening. This dovetails almost perfectly with the GPS data that we also received. And my recollection of that evidence is that it shows that [defendant] arrived at the second restroom in the park at 7:39, one minute difference. Those photos items, 1 though 10 and the video go on though 2:52 GMT and the GPS data shows that the defendant was moving north from the park at 7:56.

"So that offers a window of approximately four minutes after the photos would have been taken. So the fact that these were deleted from one through nine on that day, I don't—I don't have an explanation for that. I don't know if those were taken earlier in the evening and deleted. But I do know I think it's persuasive and more than a coincidence that these items line up as closely as they do between the timestamp on the phone and GPS data.

"Also, there is no indication that any of this evidence would have exonerated the defendant. The witness testified and was cross-examined about whether or not she consented and she did not with regard to any of this behavior. And for that reason I think the Trombetta motion should be denied.

"THE COURT: [Defense counsel]?

"[DEFENSE COUNSEL]: Yes. In terms of the times that [the prosecutor] indicated I believe some of these photos were taken on the exact same minute. So a four-minute window is plenty of time to take 20 or 30 extra pictures. I don't believe the time is significant in itself to show that there was an absence of time to take photos; additional nine photos.

"Again, I believe the biggest—well, other than the fact that photos were deleted, the fact that she stated when asked regarding the photos were deleted she said not that I could remember and I wrote that down and I put it in quotes. I believe that in itself is a one piece of evidence. It's either yes or no, not that I could remember is a very evasive type of answer. She was given that phone by Detective Alva to show that to turn the phone off. She had a working knowledge of that phone. That's why Officer Alva gave it to her to turn the phone off in the first place and she was able I believe to do that eventually.

"So that's what I would say in response to the district attorney. And I believe that that evidence might exonerate my client as to two of the charges. Submit. [¶] … [¶]

"THE COURT: All right. Well, we have a phone. We know it's the defendant's. We know that nine pictures taken on that day and one video taken on that day[] according to the testimony have been deleted. What we don't know is when they were taken. What time they were taken. And when they were deleted. And who deleted them. And basically what we have is speculation as to those issues. I think Trombetta requires the defense to prove more than speculation. I don't think the defense has done that in this case. The witness did testify that she doesn't remember deleting any photos. And she talked about what she did with the phone. She looked for a number for I think her mom on the phone and then but she didn't indicate at any time that she attempted to delete any pictures or that she deleted any pictures. The fact that she says she can't remember, witnesses say that all the time. She didn't remember deleting any pictures. And if she had deleted them I'm sure she would have remembered it. I believe she would have remembered it.

"So for that reason I just don't think the defense has met their burden in this matter. The Court's going to deny the motion to exclude the evidence under *Trombetta*."

C.      **Analysis**

1.      *Exculpatory Value*

Defendant contends defense "counsel's performance was deficient when he successfully objected to testimony that the officer had knowledge there were nude photos on the phone, showing she was aware of the nature of the evidence, a necessary element under *Trombetta*."

Despite defendant's contention, the evidence defense counsel succeeded in excluding following his objection and a motion to strike does not establish Officer Alva was "aware of the nature of the evidence." The officer only testified she "looked at the images [on the phone] with Detective Garibay when [Jane] indicated that there w[ere] some nude photos of her and other photos of her." That statement, even in the absence of an objection, does not bolster defendant's argument that defense counsel was ineffective. The testimony does not speak to whether Alva saw all of the images that were available

39.

on defendant's phone, including the images that were subsequently deleted. The testimony does not address whether any of those images were exculpatory in nature. All the statement provides in terms of evidence is that Alva viewed certain images on defendant's phone, while in the presence of Detective Garibay, at some point prior to Jane's interview on the evening of defendant's arrest. Alva's statement does not in any way speak directly to the content or nature of the images viewed.

In this case, defense counsel was merely speculating that the deleted evidence was exculpatory. There is nothing to indicate the images Alva viewed on defendant's phone included the deleted images. Even presuming those images were available at the time of Alva's observation, there is nothing to indicate they were exculpatory—such as Jane smiling or laughing in the photos—as appellate counsel postulates. Mere speculation as to the exculpatory value of destroyed evidence is inadequate to establish a *Trombetta* claim. (*People v. Alexander* (2010) 49 Cal.4th 846, 878–879 [defendant's claim that erased audio tape had exculpatory value based on speculation something on it would have contradicted evidence unfavorable to defense]; see *People v. Cook* (2007) 40 Cal.4th 1334, 1348–1351.) Thus any exculpatory nature was not known before the evidence was destroyed. (*People v. Lucas*, *supra*, 60 Cal.4th at p. 221.)

Notably, defendant fails to explain what could have possibly been depicted on the photos that would establish Jane consented to having sexual relations with her father. *At most*, even assuming an exculpatory nature, based upon the testimony given at trial, the missing photos could only have depicted consent by Jane to having nude photos taken in a park restroom. In other words, that consent would not extend to the sexual acts that took place subsequently behind the retail storefront, to wit: the rape and oral copulation.

Further, defendant does not address how—again, assuming an exculpatory nature—that evidence stands in relation to the evidence recovered from defendant's phone and admitted at trial. Those photos[7]—taken subsequent to the deleted photos—

---

[7]People's exhibits Nos. 4 and 5.

depicted Jane's breasts, her buttocks, and several depicted her vagina, the majority of which also included defendant's hands or fingers on Jane's vagina. Jane consistently testified she was forced to pose for the photos and followed defendant's commands.[8] Thus, even if Jane was smiling in the photos, her expressions were not necessarily evidence of consent. Certainly none of the photos admitted at trial definitively established Jane's consent.

Significantly, Jane's testimony concerning the photos admitted at trial casts great doubt on whether the deleted photos were taken during the encounter on the evening of September 22. Specifically, when asked to identify the photos comprising People's exhibit No. 4, Jane testified the photos appearing in the top row were the first photos defendant took of her in the restroom that evening:

> "[PROSECUTOR]: … And I'm going to ask you to look right at that top photograph. Here. [¶] Do you recognize that photograph?
>
> "A Yes.
>
> "Q Can you tell me what it's a picture of?
>
> "A Of my breasts.
>
> "Q Do you know when that photograph was taken?
>
> "A *That's the first photograph.*
>
> "Q That's the first photograph?
>
> "A Yes.
>
> "Q Was it taken on the night that you [have] been telling us about?
>
> "A Yes.
>
> "Q And who took that photo?
>
> "A [Defendant]. [¶] … [¶]

---

[8]During cross-examination, Jane was asked to look at her face in the photos admitted. Although the record does not reflect whether Jane reviewed People's exhibit No. 4 or 5, Jane did testify that her "face look[ed] wet," as if she had been crying.

"Q Can you tell me the photograph next to it, do you recognize that photograph?

"A Yes.

"Q And what's that a photograph of?

"A Of my breasts and my body, I guess.

"Q And when was that photograph taken?

"A When he had me against the railing.

"Q Do you see your bra in that photograph?

"A Yes.

"Q And where is it?

"A On the railing?

"Q And is that where it was that night?

"A Yes.

"Q *So [they're] both the first and the second picture taken in [the] restroom in the skate park that night?*

"A *Yes.*" (Italics added.)

In any event, we agree with the court that defendant failed to sustain his burden of proving the unavailable evidence had any exculpatory value. And, "if the best that can be said of the evidence is that it was 'potentially useful,' the defendant must also establish bad faith on the part of the police or prosecution. [Citations.]" (*People v. Alvarez, supra,* 229 Cal.App.4th at p. 773.)

### 2. *Bad Faith*

On appeal, defendant maintains there was "abundant evidence" of Officer Alva's animus toward defendant. We disagree.

The fact a defendant attempted escape, resisted arrest, assaulted a police dog, and cursed at an officer does not establish animus toward a defendant. Were that the case, animus would be easily proven in many cases. In fact, on cross-examination after having

42.

been called as a witness in the defense case, Officer Alva testified she would never "lie to make sure that [defendant] stays in prison the rest of his life," nor would she falsify a report, testify untruthfully, or "shade the facts to make [defendant] look more guilty or more culpable." She testified that her job required her to document and collect "everything" in the search for truth.

Alva did in fact allow Jane access to defendant's phone. However, there is no evidence Alva allowed Jane such access in order to provide her with an opportunity to tamper with the evidence. Alva testified Jane was asked to turn off defendant's phone and had temporary possession of his phone in order to do so. Specifically, Alva indicated Jane had access to the phone while she was out of the room, at a distance of about four feet, speaking to Detective Garibay for "maybe 30 seconds." When Alva reentered the interview room, Jane handed the phone back to her. Alva's testimony is corroborated by Jane; Jane testified that when she opened defendant's phone, Alva "was right outside the door talking to another officer." Jane also testified that on one occasion she picked up defendant's phone, looked at it, and advised Officer Alva that defendant's girlfriend was the caller. Defendant's argument that bad faith on the part of the state existed is nothing more than mere speculation. There is simply no evidence that law enforcement personnel, and Officer Alva in particular, acted in bad faith by allowing Jane brief access to defendant's cell phone.

Lastly, defendant makes much of the words or phrases used by Jane when she testified about her access to defendant's phone during the interview with Officer Alva. He alleges her responses were evasive and thus her testimony was not credible. However, a careful review of the record reveals Jane used similar words and phrases in answering other questions posed to her: In response to a question about whether defendant slapped her in the face, Jane replied, "Not that I could remember"; in response to a question about whether defendant gave her a second hickey on her arm, Jane said, "Not that I can remember"; in response to a question about whether she had any bruises on her arms, Jane replied, "Not that I can remember"; and when asked whether there

43.

were any marks or bruises on her face from defendant pushing her, Jane stated, "Um, not that I could remember." Jane's testimony is not evasive; rather, it is the usual language of this 15-year-old girl.

### 3. *Defense Counsel*

Because we have determined the alleged exculpatory nature of the photos deleted from defendant's phone is nothing more than mere speculation on defendant's part, and because defendant cannot show bad faith on the part of the police, we very briefly address his claims of ineffective assistance of counsel.

For the reasons explained above, defense counsel cannot be said to have performed below an objective standard of reasonableness. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 687.) Moreover, based on the overwhelming evidence of defendant's guilt on this record (discussed, *ante*), we conclude he has failed to demonstrate a reasonable probability that, even assuming defense counsel erred, the result of the proceeding would have been different absent such error.

In conclusion, defense counsel did not render ineffective assistance of counsel when he successfully excluded certain evidence elicited during Officer Alva testimony, nor by failing to assert bad faith on the part of Officer Alva.

## V. Sufficiency of the Evidence

Finally, defendant contends there is insufficient evidence that he kidnapped Jane, substantially increasing her risk of harm over and above the level of risk necessarily inherent in the underlying offenses. Therefore, he argues the true finding pursuant to section 667.61, subdivisions (a) and (d) must be reversed. We do not agree.

### A. Legal Standards

The applicable legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial

44.

evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). ""Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the … [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citations.]" [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 361.) "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Section 667.61, provides, in pertinent part, as follows:

"(a) Except as provided in subdivision (j), (*l*), or (m), any person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life. [¶] … [¶]

"(c) This section shall apply to any of the following offenses:

"(1) Rape … [¶] … [¶]

"(4) Lewd or lascivious act … [¶] … [¶]

"(7) Oral copulation … [¶] … [¶]

"(d) The following circumstances shall apply to the offenses specified in subdivision (c): [¶] … [¶]

"(2) The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)."

## B.    Analysis

In *People v. Robertson* (2012) 208 Cal.App.4th 965, this court concluded:

"'Kidnapping to commit rape involves two prongs. First, the defendant must move the victim and this asportation must not be "merely incidental to the [rape]." [Citations.] Second, the movement must increase "the risk of harm to the victim over and above that necessarily present in the [rape]." [Citation.] The two are not mutually exclusive, they are interrelated. [Citation.] [¶] 'For the first prong, the jury considers the distance the defendant moved the victim and the "scope and nature" of the movement. [Citations.] For the second, it considers whether the movement gave the defendant "the decreased likelihood of detection" and an "enhanced opportunity to commit additional crimes." [Citation.]' [Citation.]" (*Id.* at p. 983.)

Specifically, defendant argues that although he moved Jane from the park to the alleyway, there is no evidence "crimes such as robberies, homicides or assaults took place" there, thus Jane was "not in danger from crimes of violence against her person save for" his actions against her. Defendant's argument misses the mark. The danger presented need not come from a third party. Nor must the crime associated with the alleyway present a danger of similar crime to that perpetrated by defendant. Here, Jane testified there were people present at the park. She also testified that during the assault that took place in the park's restroom, a woman entered the restroom and briefly interrupted defendant's assault. However, when defendant drove Jane to the area behind the retail storefront, there were no other people around. Officer Alva testified that she patrolled that alleyway three to four times per night because it is a high crime area, and a "thoroughfare for criminal activity." The area is dark, particularly behind the dumpsters, and one streetlamp "might have been" operable. By parking the vehicle between or very near the two dumpsters in the alleyway, the car was largely blocked from view.

Defendant also argues a "major deficiency in proof" arises from the fact Jane could not lie down in the restroom stall at the park; therefore, sexual intercourse would "have been difficult if not impossible in the stall either in a prone position or in the hands and knees position Jane described in the car. In other words, movement of Jane was necessary" to complete at least one of the underlying offenses. This argument lacks merit. Sexual intercourse does not require a prone position. Nor is the "hands and knees position" the only other manner in which intercourse can be accomplished. Additionally, read carefully, the record reveals Jane initially testified there was room to lie down in the restroom stall. However, when Jane hesitated in response to defendant's command that she lie down, defendant pushed her down and backed her into the area next to the toilet and an adjoining wall. At that point, she was unable to lie down.

Defendant also complains that without "any evidence as to how dangerous a place the public restroom at the park was around dusk," it is "impossible to conclude" that defendant's movement of Jane substantially increased her risk of harm over and above that necessary to commit the underlying offenses. Not so. There is sufficient evidence in the record where Jane testified there were people present in the park during the relevant time period, yet there was no evidence of any other persons present in the area behind the retail storefront.

Here, there was sufficient evidence to conclude defendant's movement of Jane from the park to the alleyway substantially increased her risk of harm. The alleyway was isolated and dark. The park was a public setting, and while the alleyway was not closed to the public, it was clearly less traveled. Moreover, defendant parked his vehicle between or near two dumpsters, decreasing the likelihood he would be discovered while he committed the sexual assault against his daughter. (Accord, *People v. Shadden* (2001) 93 Cal.App.4th 164, 169 ["where a defendant moves a victim from a public area to a place out of public view, the risk of harm is increased even if the distance is short"]; *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1049 [moving victim from illuminated area to park area where could not be seen increased risk of harm by decreasing likelihood

of detection]; *People v. Diaz* (2000) 78 Cal.App.4th 243, 249 ["the risk to the victim in the dark and isolated location of the attack increased significantly as compared to the lighted sidewalk near the bus stop where the incident began"].)

In sum, there was substantial evidence—of reasonable, credible and solid value—to support the trial court's true finding regarding the section 667.61 kidnapping enhancement. Reversal is not required.

## DISPOSITION

The judgment is affirmed.

_____

PEÑA, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

DETJEN, J.

48.